

Matin Emouna
*Admitted in NY, NJ & CT*
memouna@emiklaw.com

**MEHDI MOSLEM'S INITAL OBJECTIONS**
**TO THE PRESENTENCE INVESTIGATION REPORT**

August 25, 2021

chambersnysdseibel@nysd.uscourts.gov
Honorable Cathy Seibel
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

      Re: *United States v. Mehdi Moslem* 18 Cr. 547 (CS)

Dear Judge Seibel:

  Hope this correspondence finds you and your staff healthy and safe.  First and foremost, please allow me to take this opportunity to commend Nichole Brown-Morin for the thoroughness of the Presentence Investigation Report. Her thoroughness is impressive in light of the limited time she had to prepare the PSR.

  Defendant, Mehdi Moslem, by and through his attorney, Matin Emouna, of Emouna & Mikhail, PC, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3553(a), respectfully submits the following Objections to the Draft Presentence Investigation Report (hereinafter "PSR").

  Mehdi Moslem respectfully objects to the Probation Department's offense level computation, according to the PSR, **Paragraph 28**, because the loss was $2,915,558.22, sixteen levels are added, pursuant to USSG § 2B1.1(b)(1)(I).  This is incorrect for a myriad of reasons. First, the purported loss amount includes loss that is alleged to be "relevant conduct," nevertheless, such loss does not fall within the definition of "relevant conduct" as set forth in U.S.S.G. § 1B1.3. Second, the use of such a loss amount violates the due process clause to the United States Constitution. Finally, even assuming that such "loss" does, in fact, qualify as relevant conduct and that the use of such a loss amount does not offend the due process clause, the computation of such loss is grossly incorrect.

  To be considered "relevant conduct," an additional loss figure must be determined to be "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). "Common scheme or plan" requires that the conduct set forth in the count of conviction and the conduct at issue "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 (Application Note 9). "Same course of conduct" requires that the conduct set forth in the count of conviction and the conduct at issue be "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or


ongoing series of offenses." Id. Relevant to the "same course of conduct" inquiry is whether the conduct can "readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." Id. U.S.S.G. § 1B1.3 (Background). For U.S.S.G. § 1B1.3(a)(2) to apply, "the government must demonstrate a connection between [the alleged relevant conduct] and the offense of conviction...." United States v. Pinnick, 47 F.3d 434, 438, 39 (D.C. Cir. 1995) (emphasis in original)

When one looks at the PSR, especially the restitution amounts, it is obvious that the Probation Department did no independent investigation of the transactions in this case and, instead, blindly relied upon information given to it from the government. Second, the Probation Department made any attempt whatsoever to determine which loans were obtained by providing materially false information. It is simply not proper to total any loan that was connected to, even if the loan was not obtained by providing materially false information.

Likewise, the loss figure set forth in the PSR ignores Application Note 8(b) to the U.S.S.G. § 2F1.1. That Application Note provides:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

Nevertheless, the PSR includes loans that were declined. Likewise, it fails to account for loans that were repaid and amounts that the banks "can expect to recover" either through future payment as securities. Therefore, when all is said and done, any loans that were properly included in the loss amount would be limited to the difference between the loan as made and the loan amount that would have been approved absent the false information

The PSR loss figure should be based upon actual loss to the bank.  Note 8(b) to U.S.S.G. § 2F1.1 provides that fraudulent loan cases are to be treated differently than other fraud cases encompassed by that guideline. Indeed, the loss figure is obtained by using the actual or expected loss unless the intended loss is shown to be greater. In this case, Mehdi Moslem had every expectation that the loans based upon false applications would be paid off. Indeed, although it can be argued that increasing the client's income, and assets in business on some applications, none of these loans would have been approved without the client having an excellent credit history as verified by the banks' underwriting department. Likewise, many of these loans were collateralized. In short, the intended loss in this case was $0.

The sentencing guidelines define "loss" as "the greater of actual loss or intended loss," [1] and provide that the sentencing judge "need only make a reasonable estimate of the loss." [2] When

---

[1] See United States Sentencing Commission, Guidelines Manual, §2B1.1 (Nov. 2018) [hereinafter USSG]. USSG §2B1.1, comment. (n.3(A))

[2] USSG §2B1.1, comment. (n.3(C))

calculating the intended loss, absolute accuracy is not required as long as the calculation is not "outside the realm of permissible computations."[3] The estimate should be based on available information, and the court may consider a variety of different factors. In making the loss calculation, the court may also choose from competing methods of calculating loss. Restitution and loss are separate issues, and there need not be "symmetry" between the two.[4]

In 2008, the Second Circuit established a principle affecting the determination of intended loss in a major financial fraud case that may prove to be important to defendants charged with crimes growing out of the financial collapse. For the first time, the Second Circuit made it clear that "intended loss" means just what it says—the loss actually intended by the defendant—not the potential or possible loss. United States v. Confredo, 528 F.3d 143 (2d Cir. 2008), involved the owner of a financial services company who helped failing businesses obtain loans by falsifying financial information on loan applications to make the businesses appear credit worthy. Over the course of three years, Gary Confredo helped his customers submit more than 100 applications for loans totaling more than $24 million. Even though Confredo used his experience as a former bank loan officer to put together loan applications he knew would have a good chance of being approved, only about half the loans were actually granted. At the time the fraud was discovered, the actual loss to the banks was a little more than $10 million.

The question before the court was what constitutes "intended" loss. Although Confredo never personally intended to make any loan payments, his clients had repaid at least $1.5 million in principle by the time the fraud was discovered. The prosecution nevertheless argued in the district court that the intended loss was more than $20 million requested in the loan applications. The defense argued that there were two reasons why the loss was more than $10 million but less than $20 million. First, the defense argued that as a former bank loan officer, Confredo knew that no matter how credit worthy the phony applications made his clients appear, the banks would deny a number of the claims outright and fund others at lower amounts. He also knew that this was true from his experience in submitting the more than 100 loan applications over a three-year period. Second, the defense argued that Confredo expected at least some of his clients to make payments on the loans. It was in Confredo's interest to select clients who could and would make as many payments on the loans as they could, since the longer the fraud went undetected, the more money Confredo could make. The district court judge, Leonard Sand, Sr., accepted the prosecution's arguments and ruled that the amount of loans applied for was the intended loss, because:

---

[3] United States v. Sullivan, 765 F.3d 712, 716 (7th Cir. 2014) (quoting United States v. Jackson, 25 F.3d 327, 330 (6th Cir. 1994)).
[4] United States v. Kuhrt, 788 F.3d 403, 423 (5th Cir. 2015) (rejecting defendants argument that the government's inability to calculate restitution demonstrates that total loss also can't be determined because they are "wholly distinct questions"); United States v. Patterson, 595 F.3d 1324, 1327–28 (11th Cir. 2010); see also United States v. Certified Envtl Serv., 753 F.3d 72, 103 (2d Cir. 2014) (reversing, inter alia, because district court conflated loss and restitution; emphasizing distinctions between these concepts); United States v. Riddell, 328 F. App'x 328, 329 (6th Cir. 2009) (per curiam) (holding that a district court may look to intended loss in calculating total loss for the purposes of §2B1.1, but must base its order of restitution on actual losses).

> Confredo is not a borrower who used fraud to obtain a loan which he then paid back in full. Confredo secured loans for dozens of entities and he retained no control whether those loans were paid off, nor did his remuneration change depending on whether the borrowers paid any of the funds back. (528 F.3d at 148 (internal citation omitted).)

The Second Circuit reversed. The court of appeals started its analysis with a review of the history of the way loss has been determined under the guidelines. The court noted that prior to the amendment of Application Note 7 to the former 2F1.1, it had held that intended loss in loan procurement frauds "was the total value of the loan obtained or sought, without regard to whether the defendant had intended to repay the lender." (528 F.3d 150.) That rigid interpretation of loss began to change with the Third Circuit's groundbreaking decision in United States v. Kopp, 951 F.2d 521 (3d Cir. 1991) (Becker, J.):

> Judge Becker's opinion disagreed with Brach and sided with a Seventh Circuit opinion authored by Judge Posner, see id. at 529, 532-33, which had observed that it was "simple" but "irrational" to treat all frauds as equivalent to thefts, preferring an approach that took account of whether the defendant actually intended to pocket the face value of the amount he had fraudulently procured, see United States v. Schneider, 930 F.2d 555, 558-59 (7th Cir.1991). In addition, based on a careful analysis of the then-applicable version of section 2F1.1, Judge Becker rejected an approach that equated the Guidelines-approved measures of "probable" or "intended" loss with "the worst case scenario [of] potential loss (here, the face value of the loan)." Kopp, 951 F.2d at 529; see also id. at 533. Finally, Judge Becker observed that the approach taken by Brach was inconsistent with the 1991 amendments to Note 7. See id. at 534-35. (528 F.3d at 151-52.)

Following Kopp and the 1991 amendment to Note 7, the Second Circuit "left open the possibility that a defendant is free at sentencing to present evidence of his intent regarding the issue of loss." (Id. at 152.) In Confredo, the court made explicit what in the Second Circuit had only been implied before—in fraud cases, "intended loss" refers to a defendant's "subjective intent." (Id.) The principle established in Confredo will have the greatest impact in cases in which a defendant intends little or no loss, but where the potential for loss is greater than the loss that actually resulted.

Mehdi Moslem respectfully objects to the Probation Department's offense level computation, according to the PSR, **Paragraph 29**. The Guidelines provide for a two-level enhancement if the offense "involved sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). "Sophisticated means" is defined in Application Note 9 of the commentary to § 2B1.1 as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). Conduct such as hiding assets or transactions "through the use of fictitious entities, corporate shells, or offshore financial accounts" ordinarily indicates sophisticated means. Id. In the case at hand the trial testimony clearly provided that Mehdi Moslem was not a sophisticated person in any way shape or form.  Most important, Mehdi Moslem did not know and to date does know how to text or email.  Clearly the defendant's

conduct does not match the examples given in Application Note 9, and must not be considered sophisticated.

Mehdi Moslem respectfully objects to **paragraphs 22 through 23** and states that he did not obstruct justice. Defendant denies that any conduct contained in the other allegations contained in the other paragraphs constitute obstruction of justice. Defendant is in agreement with the PSR that the Court is in the best position to determine in Mr. Moslem obstructed justice.

Mehdi Moslem respectfully objects to the Probation Department's assessment, according to the PSR, **Paragraph 85**, that the "probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range." According to U.S.S.G. § 5H1.1 age (including youth) "may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines." If the defendant is elderly and infirm, however, and "where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration," age may be a reason to depart downward. Clearly the 72-year-old Mr. Moslem, based on the medical reports provided from prison, without question, suffers from a variety of serious health issues. As it is, his life expectancy is short. Mr. Moslem has serious medical problems present to an unusual degree such that a significant downward departure under this provision is warranted. As such he is unlikely to ever offend. See U.S.S.G. 5H1.1.

In addition, 5H1.4 allows a downward departure any time a sentencing court is presented with sufficient evidence of a serious physical impairment. Decisions from this district and this circuit recognize that departures are appropriate when a defendant faces severe medical problems.

In <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir. 1996), the defendant, a state police Sheriff, was convicted of mail fraud and violations of the Travel Act based on a scheme to extort money from the deputies he appointed. The district court departed from the Guidelines-range sentence of about three years imprisonment and imposed a sentence of three months' probation, six months home confinement, and 500 hours of community service. The court justified the departure based on the defendant's "good acts" and his compromised health, which the Second Circuit described as follows: "He had a kidney transplant some 20 years ago, and as a result of the drugs prescribed for his kidney trouble, Rioux developed bone problems requiring a double hip replacement. His doctor stated that Rioux's condition required regular doses of medication and blood tests." Id. at 654. On appeal of the sentence by the government, the Second Circuit held that the district court did not abuse its discretion by imposing the non-prison sentence based on its consideration of Rioux's health problems. Id. at 663.

In <u>United States v. Barbato</u>, No. 00-CR-1028, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002), the defendant, who had a history of serious heart problems, pled guilty to using "extortionate means to collect extensions of credit." The district court (Judge Kram) granted a downward departure from a Guidelines range sentence of 24-30 months imprisonment based on the defendant's health conditions and sentenced him to 12 months of home confinement and 2 years of supervised release. Notably, the court imposed the sentence of home confinement even though the government presented evidence that the Bureau of Prisons was able to provide adequate

treatment for the defendant's conditions. The court noted that "[i]t is often relevant, though not always controlling, whether the BOP can provide adequate care." Id. at *4.

It should be further noted "management problems with elderly inmates, ... are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment. Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp 9 and 10. The report notes on page 10 that first time offenders are "easy prey for more experienced predatory inmates." It should be noted that throughout the report, the elderly are defined by the various institutions as 50 or older.

Mehdi Moslem respectfully objects to the Probation Department's assessment of Reinstitution, according to the PSR, **Paragraph 80.** Nowhere is the Probation Department's blind reliance on what it was told by the government (who, in turn, simply provided the Probation Department figures obtained from Walden Bank, IRS and NYS Department of Taxation and Finance) more evident than the Restitution portion of the PSR. Indeed, the PSR claims that restitution should be ordered in the amount of $1,288,658.22.  It is noteworthy that many if not all of the Tax warrants were paid off at the time of the sale, of Exclusive.

For the above reasons, defendant Mehdi Moslem through counsel, respectfully rejects the loss as being $2,915,558.22 sixteen levels enhancement, pursuant to USSG § 2B1.1(b)(1)(I), the two-level enhancement for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), and respectfully requests a downward departure pursuant to U.S.S.G. 5H1.1 and 5H1.4.

WHEREFORE, Defendant hereby files his objections to the Presentence Investigation Report and requests a Hearing where the Government would be required to carry its burden to prove the conclusions contained in the PSR.

                                          Respectfully Submitted,

                                          MATIN EMOUNA

To:   Nichole Brown-Morin
      AUSA Daniel Loss
      AUSA James McMahon
      AUSA Nicolas Bradley
      Marc Agnifolo, Esq.
      Zach Intrater, Esq.