UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

             Plaintiff,

       vs.                        Docket No. 19 Cr. 547 (CS)

SAEED MOSLEM,

             Defendants.
-------------------------------------------------------X

### DEFENDANT'S PRO SE MOTION FOR A NEW TRIAL, PURSUANT TO RULE 33(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

NOW COMES, SAAED MOSLEM, appearing *pro se*, and respectfully moves

this Court for an order setting aside the jury verdict, and ordering a new trial,

pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.

### BACKGROUND

Defendant was convicted after a jury trial in this matter, and familiarity with

the circumstances and offenses are presumed. In the interest of brevity, only the facts

and proceedings relevant to this motion are set forth herein.

### STATEMENT OF RELEVANT FACTS

The evidence introduced during the trial included testimony for from a

cooperating witness – Stephen Strauhs ("Strauhs"). Earlier investigations between

the United States clearly revealed a lack of reliability of Strauhs's information. *See*

Exhibit A (email from AUSA Daniel Loss to defense counsel Richard Willstatter

dated Dec. 30, 2019); Exhibit B (email from defense counsel Richard Willstatter to forensic accountant Preston Faro, dated Jan. 21, 2021). Strauhs, who was an accountant retained by Defendants, testified that he was furnished tax information by Defendants that was inconsistent with accurate information. However, the Government was well aware that the information furnished by Strauhs was inaccurate, and confided as much in defense counsel.

In addition, during the trial, the Government introduced testimony that the tax assessed value of the property provided as collateral for certain loans that the Government characterized as fraudulent demonstrated that Defendants had made material misrepresentations in the loan applications. However, the Government (and defense counsel) deliberately withheld from the jury that the loans had been over-collateralized, and that the fair market value of the property actually far exceeded the loan amount – thereby negating any suggestion of an intent to defraud a financial institution (an essential element of the conspiracy offense). Had the evidence of over-collateralization not been deliberately withheld from the jury by the Government (and defense counsel), Defendants would have been acquitted inasmuch as such a fact conclusively establishes that the Defendant's could not have intended to cause any harm to the lending institutions.

Prosecutors knowingly used tax assessed value and represented it as true fair market value. *See,* Exhibit C (email from defense counsel Richard Willstatter to AUSAs James McMahon and Daniel Loss dated Nov. 17, 2020); Exhibit D (Certified Bank Appraisal Riverside/Salisbury Bank dated July 21, 2011); Exhibit E (Certified Bank Appraisal Noah Bank dated Sept. 24, 2018); Exhibit F (email from defense counsel Richard Willstatter to AUSAs Daniel Loss and James McMahon dated Nov. 10, 2020). To be sure, Certified bank Appraisal (which establish the fair market value of the collateral) conclusively establishes that the value of the property far exceeded the loan amount, and establishes that no harm could have come to the lending institutions, thereby negating an intent to defraud.

Furthermore, the Government introduced testimony that purportedly showed that Defendants had under-reported the income for Exclusive Motor Sprots (Form 1065) for the years beginning in 2010 and ending in 2015. However, forensic accounts conclusively determined that, in fact, Defendant over-reported their income for the relevant periods. This information was known to the Government, who participated in meetings with Defendant's accountants. Despite the information gleaned from those meetings, which conclusively established both over-collateralization and over-reporting income for Exclusive Motorsport, the Government introduced perjured testimony that was tailored to ensure a conviction.

-3-

## TIMELINESS OF MOTION

Rule 33(a) authorizes a district court to set aside a verdict and order a new trial in the interest of justice if a defendant moves for such relief within 14 days of the guilty verdict. Fed. R. Crim. P. 33(b). This motion is being brought outside the 14-day period prescribed by Rule 33(b). However, inasmuch as the claims are predicated, in large part, on ineffective assistance of counsel, and Defendant was represented by the same attorney during the 14-day period after the jury verdict, the Second Circuit has found that such circumstances amount to "excusable neglect," and the instant motion is therefore timely. *See, e.g., United States v. Brown*, 623 F.3d 104, 113 (2d Cir. 2010); *United States v. Scali,* No. 16 Cr. 466 (NSR), 2018 WL 3536082, at *2 (S.D.N.Y. July 23, 2018); *United States v. Kenner*, 272 F. Supp.3d 342, 420 (E.D.N.Y. 2017)(excusable neglect where, among other things, trial counsel continued to represent defendant through 14-day post-conviction period).

Accordingly, this motion is timely, and the Court should proceed to the merits since Defendant was represented by the same attorney during the 14-day period after the jury verdict. That attorney colluded with the Government to ensure that evidence favorable to Defendants was kept from the jury, and to ensure that the Government's

-4-

misconduct of knowingly introducing false and perjured testimony during the trial went unopposed. Thus, this motion could not have been filed within the time allotted by Rule 33(a), and he has sufficiently established "excusable neglect" making this motion timely.

## ARGUMENTS

### COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE GOVERNMENT'S KNOWING INTRODUCTORY OF PERJURED TESTIMONY DURING THE TRIAL, AND FOR THEIR WITHHOLDING FROM THE TRIAL JURY EVIDENCE THAT WAS FAVORABLE TO DEFENDANTS, AND THE COURT SHOULD SET ASIDE THE VERDICTS, AND PROMPTLY GRANT DEFENDANTS A NEW TRIAL

The standard governing ineffective assistance of counsel is a familiar one. To sustain a claim, a defendant must prove (1) deficient performance, and (2) prejudice resulting from counsel's unprofessional errors. *See, generally Strickland v. United States,* 466 U.S. 668 (1984). Here, Defendant submits that counsel's performance was deficient in that counsel colluded with the Government to permit the knowing introductory of perjured testimony, in violation of Defendants' right to a fair trial, and in withholding from the jury the fact that the loans that form the basis for the alleged fraud conspiracy were over-collateralized – negating the alleged intent to defraud, and conclusively establishing that there could have been no intent to defraud or a possibility that the financial institutions would suffer a loss.

-5-

"In deciding whether a new trial is required due to the prosecutor's knowing introduction of perjured testimony, the appropriate inquiry depends on the 'materiality of the perjury to the jury's verdict and extent to which the prosecution was aware of the perjury.'" *United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008)(quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). Here, as noted, the Government was aware of perjured testimony it introduced by and through Mr. Strauhs. There can be no debate as to the materiality of Staruhs's testimony on a whole. Further, testimony tending to establish that Defendant intended to defraud the lending institutions, despite the over-collateralization of the loans, was clearly material to the jury's verdict as it went to the heart of the "scheme to defraud" allegations. That testimony was false, perjurious, and the Government was well aware of the false and perjurious nature of the testimony having, itself, viewed the Certified Appraisal establishing that the value of the property far exceeded the loan request and amount.

It is well-settled that a prosecutor's knowing use of perjured testimony constitutes a violation of a defendant's constitutional rights. *Napue v. Illinois*, 360 U.S. 264 (1959). It is similarly clear in the Second Circuit that where a defendant alleged a prosecutor's knowing introductory of perjured testimony, and has offered

-6-

at least some support for these allegations, an evidentiary hearing by the district court is required. *See, Sanders v. Sullivan,* 701 F. Supp. 996, 999 (S.D.N.Y. 1987); *see also Hill v. Lockhart*, 474 U.S. 52 (1985).

If a hearing held, Defendant will offer the testimony and introduced verifiable tax documents, conclusively establishing that the Strauhs's testimony was perjured, and the Government knew. Further, Defendant would offer irrefutable testimony that the loans were over-collateralized, thereby conclusively establishing the absence of any "scheme to defraud" conspiracy. The verdicts must be set aside, and a new trial ordered, as a matter of law. At very least, a hearing is warranted in this case.

## CONCLUSION

Having made a showing of ineffective assistance of counsel, and gross governmental misconduct, an order setting aside the verdict and granting a new trial should issue, forthwith in the interest of justice.

WHEREFORE, Defendant prays that this motion will be granted.

Dated: May 2, 2022

Respectfully submitted,

*Saaed Moslem*

SAAED MOSLEM
WESTCHESTER COUNTY JAIL
P.O. BOX 10
VALHALLA, NEW YORK 10595

cc: U.S. Attorneys Office (SDNY

-7-

# EXHIBIT A

Meeting at United States Attorney's Office December 30, 2019
AUSA Daniel Loss

TAX LOSS
As to Medhi Moslem:

| 2010 | Reported Income: | $123,648 |
|---|---|---|
| | Correct Income: | $1,695,961 |
| | Additional Tax: | $526,324 |

| 2011 | Reported Income: | $250,796 |
|---|---|---|
| | Correct Income: | $500,425 |
| | Additional Tax: | $79,160 |

| 2012 | Reported Income: | $172,471 |
|---|---|---|
| | Correct Income: | $501,592 |
| | Additional Tax: | $102,863 |

| 2013 | Reported Income: | $187,692 |
|---|---|---|
| | Correct Income: | $273,854 |
| | Additional Tax: | $23,008 |

2014    No additional tax due–starting inventory was overstated, therefore
        it washes out even though the government claims the inventory was incorrectly
        reported

| 2015 | Reported Income: | $84,949 |
|---|---|---|
| | Correct Income: | $432,088 |
| | Additional Tax: | $93,665 |

TAX LOSS
As to Saaed Moslem:

| 2009 | Reported Income: | $16,542 |
|---|---|---|
| | Correct Income: | $187,842 |
| | Additional Tax: | $57,065 |

| 2010 | Reported Income: | $44,795 |
|---|---|---|
| | Correct Income: | $568,899 |
| | Additional Tax: | $165,832 |

| 2011 | Reported Income: | $95,798 |
|---|---|---|
| | Correct Income: | $179,007 |
| | Additional Tax: | $22,795 |

2012    Reported Income:     $67,835
        Correct Income:      $177,542
        Additional Tax:      $27,528

2013    Reported Income:     $49,920
        Correct Income:      $59,493
        Additional Tax:      $4,971

2014    no additional tax due

2015    no ownership in Exclusive Motor Sports reported
        However, $250,000 paid by Exclusive Motor Sports to Saaed Moslem
        accordingly, there is an estimated $50,000 tax loss
        presumably, the exact numbers taken can be determined (and their purpose)

TOTAL tax loss for Medhi and Saaed Moslem:

$1,103,211 (not including the $50,000 for 2015 attributed to Saaed)

## ADDITIONAL INFORMATION BY TAX YEAR

2009    Exclusive Motor Sports 100% owned by Saaed
        on Schedule C Form 1040 for Saaed Moslem: income reported $16,542 but actual income
        was $187,842
        this number was driven by understating year-end inventory
        actual inventory at end of 2009 was $606,121
        reported inventory at end of 2009 was $434,821
        the difference is $171,300
        reported income of $16,542 + $171,300 = $187,842 which the government says is the
        correct income figure, a 1:1
        the government is not claiming a Gross Receipts issue as to 2009

2010–2015: the agents gave "credit" when the starting inventory was overstated from previous
year, e.g., since they attribute the "correct" inventory to Exclusive Motor Sports from the end of
2009, they start with the "correct" number when determining whether or by how much the
inventory at the end of 2010 is understated.

2010    Exclusive Motor Sports is 75% Medhi and 25% Saaed
        Gross Receipts on Form 1065:     $1,733,299
        Actual Gross Receipts:           $3,829,718
        this calculation was derived from deposits into Exclusive Motor Sports' account
        but some from Exclusive Auto Group
The government says that historically Exclusive Auto Group was in the auto business, but by
2010 it was no longer primarily in that business and was used, instead, to receive rental payments
for properties rented out.

# EXHIBIT B

Here is how the government got to its figures. There is more as to Saaed because of the bankruptcy fraud. They said pursuant to a case called Fitzgerald from the second circuit (2000) that you add the tax and fraud loss together so they added the $326k and $986k for Saaed. They agreed after I corrected them that the base offense level is 6 not 7 but now they want more than ten victims for the bank fraud even though there is no loss. Ben Ostrer who is Saaed's lawyer got the government to lower the bankruptcy fraud loss based on taking off the secured part but the government still says it's more than the guidelines break number.

Richard

Sent from my iPhone

Exhibit B

Begin forwarded message:

> **From:** Richard Willstatter <Willstatter@msn.com>
> **Date:** January 21, 2021 at 4:52:19 PM EST
> **To:** Bo Faro <pbofaro7@aol.com>, Ben Ostrer <bostrer@ostrer.com>
> **Subject: Moslem**

Bo,

Here is what Mr. Loss said:

as to 2009, there is a $171,300 underreported income from inventory and $112,825 in payments to Saaed that were not business expenses.



as to 2010, no loss.



as to 2011, $38,666 underreported income from inventory.

as to 2012, $193,001 underreported income from inventory.



as to 2013, no loss.

as to 2014, $181,482.55 underreported income from inventory.

as to 2015, no underreported income from inventory, but $243,924 in payments to Saaed that were not business expenses.

as to 2016, no underreported income from inventory, but $226,447.81 in payments to Saaed that were not business expenses.

By my calculation, that is a total of $584,449.55 in unreported income from inventory. 28% of that is $163,645, the government's estimate of tax loss for Medhi.

By my calculation, the payments to Saaed according to the government total $583,196.81. 28% of that is $163,295.

163,295 + $163,645 = $326,940, the tax loss they attribute to Saaed.

Richard D. Willstatter

Green & Willstatter

Attorneys at Law

200 Mamaroneck Avenue, Suite 605

White Plains, New York 10601

(914) 948-5656

# EXHIBIT C

Exibit
C

## Green & Willstatter

ATTORNEYS AT LAW
200 MAMARONECK AVENUE
SUITE 605
WHITE PLAINS, NEW YORK 10601

THEODORE S. GREEN
RICHARD D. WILLSTATTER

(914) 948-5656
FAX (914) 948-8730

E-MAIL: WILLSTATTER@MSN.COM

November 17, 2020

Daniel M. Loss
James McMahon
Assistant United States Attorneys
300 Quarropas Street
White Plains, New York 10601

Re: United States v. Medhi and Saaed Moslem
19 Cr. 547 (CS)

Dear Dan and Jay:

Dan pointed out that the Hudson Valley Federal Credit Union application, although not approved, was for a $1,500,000 loan. This was the one for which Strauhs submitted two different tax returns. There is no "actual loss." But there is no intended loss either. Under U.S.S.G. § 2B1.1, appl. Note 3(A)(iv) "For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." In fact, the property at 279 Route 32, Central Valley –which the application states was to be collateral for the loan– was appraised at $1,550,000 in 2011. That appraisal was sent to Michael Mazzuca Jr. at Riverside Bank in July 2011. Not surprisingly, the property grew in value such that in September 2018 it was appraised at

$2,500,000. The defendants did intend to pay this loan and it was proposed to be fully collateralized. See *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2010)(the sentencing court must deduct the value of real-property collateral from loss and should also consider whether the defendant subjectively intended a lesser quantum of loss).

In fact, they later borrowed $1,162,000 from Riverside Bank against the same property. They regularly paid that loan, but a default was declared in 2017 because they had not paid the property tax on 279 Route 32. By December 2017, the principal amount of the loan was $956,636.43, but they paid more than $8,000/month during the ensuing years—mostly interest amounting to hundreds of thousands of dollars more than the $205,363 in repaid principal as of 2017. Salisbury Bank FKA Riverside paid the property tax due and extended a line of credit, so that the total owed by December 5, 2017 was $1,316,782.83. The three loans had principal amounts of $956,636.43 + $125,378.21 + $234,768.19 for a total of $1,316,782.83. In May of 2019, the Moslems settled with Salisbury Bank by paying a total of $1,477,964.00, including a payoff to Salisbury Bank of $1,328,688.00. That is $11,905.17 more than the principal for the loans. The $1,477,964 includes brokerage fees, legal fees, local taxes, mortgage taxes and other charges. Under U.S.S.G. § 2B1.1, appl. Note 3(D)(i), "Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs" are excluded from a loss calculation.

I attach letters showing the principal amounts of the Riverside/Salisbury loans, the settlement statement, and the 2011 appraisal of 279 Route 32, Central Valley, New York.

2

The remaining loans were fully paid off as we understand it. We hope we can agree on a settlement and that this work assists us in getting there. After you have had a chance to review this material, maybe we should have a conference call.

Very truly yours,

/s/ *Richard Willstatter*
Richard D. Willstatter

enclosures
cc:     Benjamin Ostrer, Esq.
        (w/enclosures)

3

# EXHIBIT D

Exhibit

D

APPRAISAL OF PROPERTY
AUTO DEALERSHIP AND REPAIR SHOP
EXCLUSIVE MOTOR SPORTS LLC
FORMERLY KNOWN AS OLSEN & TODD
OLDSMOBILE AND CADILLAC
279 ROUTE 32
ORANGE COUNTY
CENTRAL VALLEY, NEW YORK

VALUATION CONSULTANTS, INC.

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| LOCATION: | 279 Route 32<br>Central Valley, New York |
| ASSESSOR'S PARCEL NUMBER: | Town of Woodbury Section 23,<br>Block 4, Lot 4.2 |
| INTEREST APPRAISED: | Fee Simple |
| DATE OF INSPECTION<br>AND VALUATION: | July 21, 2011 |
| LAND AREA: | 1.30± acres |
| ZONING: | HB Hamlet Business<br>R-1A Residential 1 Acre |
| HIGHEST AND BEST USE<br>    If Vacant: | Commercial in HB<br>Residential in R-1A |
|     As Improved: | Commercial |
| IMPROVEMENTS<br>    Type:<br>    Year:<br>    Size:<br>    Condition: | Auto Sales & Repair Shop<br>1970<br>9,922 Square Feet<br>Average |
| VALUE INDICATORS:<br>    Sales Comparison Approach:<br>    Income Approach:<br>    Cost Approach: | "As Is"<br>$1,550,000<br>$1,450,000<br>$N/A |
| VALUE CONCLUSION: | $1,550,000 |
| MARKETING TIME: | Eighteen Months |
| EXPOSURE TIME: | Eighteen Months |

VALUATION CONSULTANTS, INC.



**Front Street**

**Newburgh, New York**

**12550**

**el. 845-565-0600**

**ax. 845-565-0699**

July 26, 2011

Mr. Michael Mazzuca Jr., VP
Riverside Bank
52 Route 17K, Suite 201
Newburgh, New York 12550

RE:   APPRAISAL OF PROPERTY - Our File E107041
      EXCLUSIVE MOTOR SPORTS LLC
      279 ROUTE 32
      ORANGE COUNTY
      CENTRAL VALLEY, NEW YORK

Dear Mr. Mazzuca:

Pursuant to your request and in accordance with the instructions set forth in the engagement letter, we are pleased to submit the accompanying self contained appraisal report on the above captioned property. The report, including exhibits, fully describes the various approaches and contains all pertinent data gathered in the investigation of the subject property.

The value opinion reported below is qualified by certain assumptions, limiting conditions, certifications, and definitions, which are set forth in the report. This report was prepared for Riverside Bank and it is intended only for their specified use. The subject property was inspected by Kim John Resch and Gregory R. Langer and this report was prepared by Kim John Resch and was reviewed by Gregory R. Langer. This appraisal report was prepared in accordance with our interpretation of FDIC, OTS and FIRREA Appraisal Policies and Guidelines.

After careful consideration we have concluded the Fee Simple Market Value of the subject property "as is," in accordance with its highest and best use including land and improvements as of July 21, 2011 to be:

**ONE MILLION FIVE HUNDRED FIFTY DOLLARS**
**($1,550,000)**

Thank you for asking us to serve you in this matter.

Respectfully submitted,

KIM JOHN RESCH                              GREGORY R. LANGER

**VALUATION CONSULTANTS, INC.**

# EXHIBIT E



Property
Appraisal
Services

*Real Estate Appraisers and Consultants*

1200 Waters Place, Suite 306, Bronx, NY 10461
Phone (718) 885-3800  Fax (718) 885-9595

September 24, 2018

Mr. Brian Kin
GEVP/CCO
Noah Bank
2337 Lemoine Avenue, 2nd Floor
Fort Lee, NJ 07024

Re:     279 Route 32
        Central Valley, NY 110917

Dear Mr. Kim:

In accordance with your request, I have inspected (R. Anastasio - Review Only) and appraised the above captioned property which is shown on the tax map of the Town of Woodbury, Village of Woodbury, Orange County, as Section 230, Block 4 Lot 4.

The subject is a one-story, slab on grade, automotive retail and service dealership building, which is owner occupied. The building was constructed circa 1960's and reflects satisfactory overall maintenance condition. The property contains approximately 10,370 square feet of gross area, situated on a 56,628-square foot site, and is in the Village of Woodbury, Orange County, Town of Woodbury, State of New York.

The purpose of this appraisal is to estimate the Market Value of the Fee Simple interest in the subject property, as of the date of inspection. This Appraisal Report is intended to comply with the reporting requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice.

The dimensions of the subject property are set forth in a plot plan together with a description of the neighborhood, both of which are part of the accompanying report. In arriving at an opinion as to the value, I have considered the type of building, the character of the neighborhood, the condition of the improvement, as well as other factors that influence value.


Property
Appraisal
Services

In my opinion, the Market Value of the property, subject to the Standard Limiting Conditions set forth in this report, in its "As Is" condition, as of the date of inspection on September 14, 2018 is:

**TWO MILLION FIVE HUNDRED THOUSAND DOLLARS**
**($2,500,000)**

In view of the current economy and rental market, it is felt that a sale could be affected at the above value within a twelve-month period.

We certified that we have carefully examined and analyzed all factors pertinent to the final estimate of value reached herein.   To the best of our knowledge this Appraisal was prepared in conformance with Uniform Standards of Professional Appraisal Practice (USPAP) and Title XI (and amendments) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

This appraisal report has been prepared for the exclusive benefit of Noah Bank.  It may not be used or relied upon by any other party.  Any parties who use or rely upon any information in this report, without preparers' written consent, do so at their own risk.

Richard J. Anastasio, MAI
NY Certified Appraiser #RG00866
(Review Appraiser)

Richard Evans, CSA
NY Certified Appraiser #RG01729

279route_2018
5

# EXHIBIT F

# Green & Willstatter

ATTORNEYS AT LAW
200 MAMARONECK AVENUE
SUITE 605
WHITE PLAINS, NEW YORK 10601

THEODORE S. GREEN
RICHARD D. WILLSTATTER

(914) 948-5656
FAX (914) 948-8730

E-MAIL: WILLSTATTER@MSN.COM

November 10, 2020

Daniel Loss
James McMahon
Assistant United States Attorneys
300 Quarropas Street
White Plains, New York 10601

Re: United States v. Medhi and Saaed Moslem
19 Cr. 547 (CS)

Dear Mr. Loss and Mr. McMahon:

Pursuant to *Brady v. Maryland*, I request the disclosure of any communications or decisions made by the government, including the United States Attorney's Office or the U.S. Department of Justice, Tax Division, not to commence a prosecution of Medhi and Saaed Moslem in the years since Stephen Strauhs commenced cooperating with the government. I point out the extraordinary length of time during which Strauhs made recordings, from April 2013 through October 2018. For example, if at one point the government decided not to prosecute the Moslems, but decided to proceed in 2019, the earlier decision could reflect considerations such as the witness's unreliability or lack of credibility.

Very truly yours,

/s/ *Richard Willstatter*
Richard D. Willstatter

cc:   Daniel Loss/ James McMahon
Assistant United States Attorneys
Benjamin Ostrer, Esq.